GEORGE F. LOUGH and Others, Respondents, *v.* A. EMILIUS OUTERBRIDGE and Others, Appellants.

*Corporations — discrimination in freights — what is not — the right of a carrier to protect itself against a competitor.*

The Quebec Steamship Company, a Canadian corporation of which Outerbridge & Co. were the New York agents, carried freight for many years between New York and the Windward Isles at from forty to fifty cents per dry barrel.

George F. Lough & Co., export commission merchants, who traded to the Windward Isles, brought an action to restrain the steamship company and its agents from exacting more than twenty-five cents per barrel upon a consignment by them to Barbadoes, and in the action obtained a permanent injunction.

It appeared from the complaint, and from affidavits read upon the motion for an injunction, that there was another steamer, "El Callao," which touched at Barbadoes, and was, as alleged by the defendants, subsidized by the government of Venezuela; that she offered to take freight at thirty cents per barrel, a rate, which the defendants alleged, was not a living rate; that, however, in order to retain their trade the defendants offered to the trade to carry freight to Barbadoes, upon days when "El Callao" sailed thither from New York, at twenty-five cents per barrel, provided that shippers would for that week ship exclusively by the defendants' line.

The plaintiffs alleged that they had chartered "El Callao;" that her freight space was full, and that having further freight which must be shipped at once they applied to the defendants, whose ship was not full, and were informed that the rate would be forty cents unless the plaintiffs would agree to ship exclusively by the defendants' line.

Upon an appeal by the defendants from an injunction order which restrained the defendants from exacting more than twenty-five cents per barrel from the defendants for freight from New York to Barbadoes:

*Held,* that the plaintiffs did not present a case entitling them to relief in equity.

That if excessive rates of freight were charged they could recover the excess at law.

That there was no unjust discrimination shown to have been made by the defendants against the plaintiffs.

That defendants were ordinary common carriers, offering to all the same rates which were not unreasonable; and provided they did so offer that they had a right to protect themselves against competitors in the trade.

APPEAL by the defendants, A. Emilius Outerbridge, Adolphus J. Outerbridge and the Quebec Steamship Company, from an order of the Supreme Court, entered in the office of the clerk of the city and county of New York on the 3d day of June, 1892, continuing, during the pendency of this action, a preliminary injunction which restrained the defendants from exacting from the plaintiffs, for the receipt and transportation of 1,700 barrels from New York to Barbadoes, more than twenty-five cents freight per barrel without further condition.

The complaint alleged that the plaintiffs were partners, composing the firm of G. F. Lough & Co., engaged in business at the city of New York as shippers of merchandise to the Windward Islands; that the defendants, A. Emilius Outerbridge and Adolphus J. Outerbridge, were partners, composing the firm of A. Emilius Outerbridge & Co., engaged in business at the city of New York as agents or managers of the steamship line of the defendant, the Quebec Steamship Company, a foreign corporation, organized and existing under the laws of the Dominion of Canada, engaged in business as a common carrier between the port of New York and the Windward Islands, and that the said steamship line is the only line engaged in the business of regular transportation between the port of New York and the Windward Islands; that the defendants have arbitrarily refused and omitted to give and now threaten to refuse to grant to the plaintiffs' terms, facilities and accommodations for the transportation of merchandise by said line equal to those granted by the defendants to other shippers of merchandise in equal or smaller quantities, and have arbitrarily exacted from the plaintiffs, and now threaten to exact a much greater rate of freight than they have at the same time exacted from shippers generally, as a condition of receiving and transporting merchandise by said line; that by reason of the premises the plaintiffs have suffered and will suffer irreparable injury.

It further appeared by the affidavit of George F. Lough, one of the plaintiffs, that the plaintiffs have recently chartered the steamship El Callao, to transport merchandise from the port of New

York, to certain of their correspondents at Barbadoes, one of the Windward Islands; and are shipping merchandise thereby; that the defendants have advertised the steamship "Trinidad," of the Quebec Steamship Company's Line to sail from the port of New York, on May 4, 1892; that the plaintiffs having orders from certain of their correspondents for upward of one thousand and seven hundred barrels of merchandise at Barbadoes, to be shipped to them at Barbadoes, and having the said merchandise ready for shipment, on May 27, 1892, offered the same to the defendants to be transported from the port of New York, to Barbadoes; that the defendants have written to the plaintiffs, as appeared by the letter thereto annexed, that although there is on the said steamship "Trinidad," unengaged cargo space, they would not transport the said merchandise by the said steamship, at a less rate than forty cents per dry barrel, though they have offered to transport the merchandise of shippers generally who are not making a shipment by the steamship "El Callao," at the rate of twenty-five cents per dry barrel; that there is now no steamship advertised to sail from the port of New York, for Barbadoes, except the said steamships "El Callao," and "Trinidad," and that the cargo space in the "El Callao," for Barbadoes is now all engaged; that the said merchandise which the plaintiffs have offered to the defendants for transportation is for shipment to certain of the plaintiffs' correspondents who have ordered the same by cable, and directed it to be shipped by first steamer. That the plaintiffs are in danger of losing the business of their said correspondents if, because of the unjust discrimination on the part of the defendant against the plaintiffs, they shall be obliged to pay as agents for their correspondence forty, per dry barrel freight, while other shippers by the same steamer for the same voyage pay but twenty-five cents per dry barrel. That for this reason the plaintiffs ask for an order to show cause returnable before June fourth, why a mandatory injunction directing the defendants to receive and transport the said cargo, or so much thereof as there shall be room for on the said steamship "Trinidad," at any time before sailing on or about June 4, 1892, to Barbadoes, in the Windward Islands, at the rate of twenty-five cents per barrel, should not issue, with a preliminary injunction until further order.

*Wilhelmus Mynderse*, for the appellants.

*Treadwell Cleveland*, for the respondents.

VAN BRUNT, P. J.:

The Quebec Steamship Company is a foreign corporation, and the firm of Outerbridge & Co., the other defendants, have for several years been its agents in New York. This company has for many years been engaged in trading between New York and the Windward Islands, and has maintained a fleet of steamers engaged in the transportation of passengers and merchandise, sailing periodically. Up to December, 1891, the standard rate of freight to Barbadoes was on a basis of fifty cents per dry barrel; at which time the standard rate of freight was reduced to forty cents, which rate the defendants claim is fair and just, and affords but a bare subsistance to the steamers engaged in that traffic. This rate has ever since been maintained upon all sailings, and for all shippers except as hereinafter stated.

The plaintiffs were engaged in the export business to the Windward Islands to a considerable extent, and claim that, from time to time, they have been obliged to, and have chartered steamers not belonging to the defendants to transport merchandise to their correspondents in the Windward Islands, and that such employment has interfered with the monopoly which the defendants have hitherto enjoyed. The defendants, upon the other hand, claim that the plaintiffs did not transport any cargo by ship under charter to them, but that a steamer called the El Callao, engaged in trade between New York and Venezuela, making sailings at intervals of about five weeks, under concessions from the Venezuelan government, which concessions enabled her to maintain the service between New York and Venezuela, offered herself for cargo, and has received and carried cargo from New York to Barbadoes; that her sailings have been regularly advertised to the trade by the agents of the steamship in New York, who were not the plaintiffs; that said steamer El Callao was seldom full of cargo which she had to carry between New York and Venezuela, and, as in the regular course of her voyage she ran near Barbadoes, she was able to carry as freight to Barbadoes, in spaces which would otherwise have been empty,

merchandise, at rates at which vessels engaged in the regular trade to the Windward Islands could not maintain themselves; that the defendant company accordingly, when one of its steamers has sailed from New York at the same time with El Callao, offered in trade competition with and for the purpose of retaining custom which had been built up by them to carry freight at the rate of twenty-five cents per barrel for shippers who would give their shipments for that week exclusively to the ship of the defendant company in preference to the El Callao; and that the rate of thirty cents, fixed by the El Callao, is one upon which vessels engaged in the regular trade could not maintain themselves. The defendants, having refused to receive freight from the plaintiffs at a less rate than forty cents per barrel at the time they were shipping by the El Callao, and having offered to take freight at the rate of twenty-five cents, provided they would stipulate not to ship to Barbadoes by steamers other than those of the defendants, the plaintiffs brought this action for an injunction restraining them from exacting from the plaintiffs, for the transportation of some seventeen hundred barrels by a particular steamer, a greater rate of freight than twenty-five cents per barrel, without further conditions. The plaintiffs obtained a preliminary injunction which was made permanent, and from the order thereupon entered this appeal is taken.

We do not think this preliminary order should have been granted, as the plaintiffs did not present a case entitling them to relief in a court of equity. It is claimed upon the part of the plaintiffs that they would have suffered irreparable damage were an injunction not issued. It is difficult to see how the impossibility of obtaining redress exists, in view of the fact that, if improper rates of freight were charged and paid by them, the excess might have been recovered in a proper action brought for that purpose.

But, further, we are unable to see that any unjust discrimination has been made by the defendants against the plaintiffs. They have offered to the plaintiffs precisely the same terms which they have done to everybody else; and we have not been able to find any rule obtaining in the case of simple common carriers which prevents them from protecting themselves against their rivals or competitors in trade, so long as, substantially, the same terms are offered to all. The mere fact that it may be more inconvenient to one to accept

the terms than to others does not constitute discrimination. The plaintiffs are studying entirely their own interests, and the defendants have some right to protect theirs.

A large number of authorities have been cited by the counsel for the respondents to support the proposition that a common carrier is bound to accept all freight offered to it at the same rates and with the same facilities. But an examination of those cases will show, with but one or two exceptions, that the common carrier was a corporation which had exercised the right of eminent domain, and had thereby become a public servant which had exercised the highest right known to the law for the purpose of affording facilities for the transportation of freight, and that, therefore, it had no right to refuse or to make any terms or conditions in respect to transportation, except fixing the rate of freight; and if this rate discriminated, then they were not performing the public functions for the performance of which they had been allowed to exercise these extraordinary powers. Such stringency of rule does not obtain where no such rights have been exercised. Hence there is a manifest distinction between the duties to the public of that character of common carriers who have exercised the right of eminent domain, because of their undertaking, and those who have not had conferred upon them any such powers. In the case at bar the defendants are ordinary common carriers. They have offered to treat the plaintiffs upon precisely the same footing as the other shippers who were their customers, and, therefore, there is no discrimination.

If any authority is needed to support what seems to be a self-evident proposition, the case of the *Mogul Steamship Company* v. *McGregor, etc.* (21 L. R., Q. B. D., 544), is one singularly in point, notwithstanding the claim upon the part of the respondents that the case at bar and the case cited have nothing in common. It seems to us that the principle which controlled that case was precisely the question which is involved in the case at bar. It is urged upon the part of the respondents that the English case was an action for conspiracy brought by one steamship company against others, alleging an unlawful combination to ruin the plaintiff's business, and that in sustaining the judgment for the defendants, entered by direction of the court, the appellate court decided merely that an unlawful conspiracy was not made out. And why? Simply because no ele-

ment of unlawfulness was found in the combination which was established. Now, what was that combination? It appears that the plaintiffs were a company of ship owners, trading between Australia and England, taking China by the way, and desirous of participating in the benefits of the transportation of tea during what is termed the tea harvest. The defendants were a number of shipping companies and private partnerships trading for the most part between England and China, and who, being desirous of keeping this valuable trade in their own hands to prevent, if they could, the ruinous lowering of freight which they contended would follow from absolutely unrestricted competition, entered into what they called a conference for the purpose of working the China tea trade by offering a rebate of five per cent upon all freights paid by shippers to the conference vessels, such rebate not to be paid to any shipper who shipped tea in any vessels but those belonging to the conference. The plaintiffs in that action thereupon commenced the same, alleging a conspiracy to ruin their trade, to recover the damages alleged to have been sustained. It was held that there being no element of unlawfulness in the combination mentioned, the action would not lie, and that the defendants had a right to combine with a view of keeping the trade in their own hands, such combination not being entered into with the intention of ruining the trade of the plaintiffs, nor through personal malice or ill-will towards them. It would seem, therefore, that a simple common carrier has the right to adopt such rules as are necessary to protect his trade, so long as those rules apply to all and do not discriminate.

The order should be reversed, with ten dollars costs and disbursements; and the motion for injunction denied, with ten dollars costs.

O'Brien, J.:

I concur in the result, but think that the court's right to interfere is not dependent upon the question whether the corporation sought to be enjoined has received any franchise or authority from the State.

As stated in *Menacho* v. *Ward* (27 Fed. Rep., 533) it is "not alone because the business of common carriers is so largely controlled by corporations exercising under franchises the privileges which are held in trust for the public benefit, that the courts have so strenu-

ously resisted their attempts, by special contracts or unfair prefer-
ences, to discriminate between those whom it is their duty to serve
impartially."

This case, which is relied upon in the court below, I think, upon
examination, will be found to support the conclusion arrived at by
the presiding justice.

The obligation upon a common carrier is well stated by WAL-
LACE, J., in that case, as follows, at page 532 : " These decisions
proceed upon the ground that the carrier is entitled to take into
consideration the question of his own profits and interests in determ-
ining what charges are reasonable. He may be able to carry a
large quantity of goods, under some circumstances, at no greater
expense than would be required to carry a smaller quantity. His
fair compensation for carrying the smaller quantity might not be
correctly measured by the rate per pound, per bushel, or per mile
charged for the larger. If he is assured of regular shipments at
given times, he may be able to make more economical arrangements
for transportation. By extending special inducements to the public
for patronage he may be able to increase his business, without a cor-
responding increase of capital or expense in transacting it, and thus
derive a larger profit. He is, therefore, justified in making dis-
criminations by a scale of rates having reference to a standard of
fair remuneration of all who patronize him. But it is impossible to
maintain that any analogy exists between a discrimination based
upon the quantity of business furnished by different classes of ship-
pers, and one which altogether ignores this consideration, and has no
relation to the profits or compensation which the carrier ought to
derive for a given *quantum* of service."

In this case it is not disputed but that the rate fixed by the
defendant, and which he asks the plaintiff to pay, is a fair and
reasonable rate for the services to be rendered, and the fact that he has
made, or proposes to make, with one individual, a rate which is less
than the fair and reasonable rate for the service, is no reason why a
court of equity should take out of the hands of the carrier the
power to regulate his business, and to receive from those asking for
the service such fair and reasonable rate as he has established, and
requires all to pay equally alike. I think the reasoning in the case
of *Mogul Steamship Company* v. *McGregor*, referred to by the

presiding justice, is conclusive upon the question presented by this appeal in favor of the view contended for by appellants.

Order reversed, with ten dollars costs and disbursements, and the motion for injunction denied, with ten dollars costs.